Michael W. Sobol (SBN 194857)
msobol@lchb.com
Nicole D. Sugnet (SBN 246255)
nsugnet@lchb.com
Michael Levin-Gesundheit (SBN 292930)
mlevin@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

Hank Bates (SBN 167688)
hbates@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
2800 Cantrell Road, Suite 510
Little Rock, AR 72202
Telephone: 501.312.8500
Facsimile: 501.312.8505

Ray E. Gallo (SBN 158903)
rgallo@gallo-law.com
Dominic R. Valerian (SBN 240001)
dvalerian@gallo-law.com
GALLO LLP
1299 Fourth St., Suite 505
San Rafael, CA 94901
Telephone: 415.257.8800

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL MATERA, as an individual, and on behalf of other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, INC.,<br><br>Defendant. | Case No. 5:15-cv-04062 LHK<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: February 25, 2016<br>Time: 1:30 p.m.<br>Courtroom: 8 - 4th Floor<br>280 S. First Street<br>San Jose, CA 95113<br>Judge: The Hon. Lucy H. Koh |

1279927.5

OPPOSITION TO MOTION TO DISMISS; 5:15-CV-04062 LHK

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

LEGAL STANDARDS......................................................................................................... 3

ARGUMENT ........................................................................................................................ 3

    I.    Plaintiff has Standing to Seek Injunctive Relief to Remedy Google's Violations of ECPA. ........................................................................................... 3

        A.    Google's New Terms of Service and Privacy Policy Do Not Protect it From Liability for its Prior Unlawful Interception of Non-Users' Emails.................................................................................................. 4

        B.    Current Users Do Not Consent to Google's Interception of Email Content. .............................................................................................. 6

        C.    Plaintiff Adequately Pled a Sufficient Likelihood of Future Harm. ......... 11

    II.    Google's Interception of Third Parties' Emails Does Not Fall Within the Ordinary Course of Business of an Electronic Communications Service Provider. ....................................................................................................... 12

        A.    This Court's Prior Opinion in *Gmail* Correctly Interpreted The Language and Purpose of ECPA................................................................. 12

        B.    Google's Cases Do Not Support Its Motion. ............................................. 15

        C.    There is No Legitimate Nexus Between the Interception of Private Email Message Content and the Ordinary Business Practices of an ECS. ........................................................................................................... 18

    III.    The Court Should Not Take the Extraordinary Step of Certifying a Settled Legal Question Under 28 U.S.C. § 1292. ................................................. 19

    IV.    The Court Has Jurisdiction Over Plaintiff's CIPA Claim.................................... 21

    V.    Google's Practices Violate CIPA........................................................................ 23

CONCLUSION ................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Arias v. Mutual Cent. Alarm Serv.*,
   202 F.3d 553 (2d Cir. 2000)................................................................................................ 17

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) .............................................................................................. 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................................. 3

*Backhaut v. Apple, Inc.*,
   74 F. Supp. 3d 1033 (N.D. Cal. 2014) .................................................................................. 8

*Bates v. United Parcel Serv., Inc.*,
   511 F.3d 974 (9th Cir. 2007) .............................................................................................. 11

*Be In, Inc. v. Google Inc.*,
   No. 12-CV-03373-LHK, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ................................. 7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................................. 3

*Campbell v. Facebook Inc.*,
   77 F. Supp. 3d 836 (N.D. Cal. 2014) ........................................................................... passim

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .............................................................................................................. 12

*Coopers & Lybrand v. Livesay*,
   437 U.S. 463 (1978) ............................................................................................................ 19

*Couch v. Telescope Inc.*,
   611 F.3d 629 (9th Cir. 2010)............................................................................................... 21

*Dahlia v. Rodriguez*,
   735 F.3d 1060 (9th Cir. 2013)............................................................................................... 3

*Davis v. Pac. Tel. & Tel. Co.*,
   59 P. 698 (Cal. 1899) .................................................................................................... 23, 24

*Dunbar v. Google, Inc.*,
   No. 5:10-CV-194-DF, 2011 U.S. Dist. LEXIS 157932 (E.D. Tex. May 23, 2011) ........... 18, 20

*Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*,
   No. C 01-2821, 2004 WL 838160 (N.D. Cal. Apr. 19, 2004) ............................................. 19

*Folgelstrom v. Lamps Plus, Inc.*,
   125 Cal. Rptr. 3d 260 (Cal. Ct. App. 2011) ........................................................................ 19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)............................................................................................................. 12

*Hall v. EarthLink Network, Inc.*,
   396 F.3d 500 (2d Cir. 2005)................................................................................................ 15

*In re Cement Antitrust Litig.*,
   673 F.2d 1020 (9th Cir. 1982).............................................................................................. 19

*In re Facebook Internet Tracking Litig.*,
   No. 5:12-md-02314-EJD, 2015 WL 6438744 (N.D. Cal. Oct. 23, 2015)............................ 22

*In re Google Inc. Gmail Litig.  ("Gmail").*,
   No. 13-md-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ....................... passim

*In re Google Inc. Gmail Litig.*,
   No. 13-md-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014)................................ 6

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Google, Inc. Privacy Policy Litig.* (*"Privacy Policy"*)
No. C-12-01382-PSG, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013) ................................ passim

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) .................................................................. 19

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) ...................................................................................... 6

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ........................................................ 6, 10, 11, 21

*James v. Price Stern Sloan, Inc.*,
283 F.3d 1064 (9th Cir. 2002)................................................................................ 19

*Kirch v. Embarq Mgmt. Co.*,
702 F.3d 1245 (10th Cir. 2012)............................................................................ 15, 16

*Luchini v. Carmax, Inc.*,
No. CV F 12-0417 LJO DLB, 2012 WL 3862150 (E.D. Cal. Sept. 5, 2012) .......................... 20

*Marquis v. Google, Inc.*,
No. 11-02808, Super. Ct. of Mass., at Suffolk (Jan. 17, 2012)............................................ 18, 20

*Moeller v. Taco Bell Corp.*,
816 F. Supp. 2d 831 (N.D. Cal. 2011) .................................................................. 12

*Murray v. Fin. Visions, Inc.*,
No. CV-07-2578-PHX-FJM, 2008 WL 4850328 (D. Ariz. Nov. 7, 2008)................................ 6

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014)................................................................................. 7

*Olagues v. Russoniello*,
770 F.2d 791 (9th Cir. 1985)................................................................................. 12

*Opperman v. Path, Inc.*,
84 F. Supp. 3d 962 (N.D. Cal. 2015) ...................................................................... 9

*People v. Leon*,
32 Cal. Rptr. 3d 421 (Cal. Ct. App. 2005),
*aff'd* 150 P.3d 207 (Cal. 2007)............................................................................... 25

*Red Mountain LLC v. Fallbrook Pub. Util. Dist.*,
48 Cal. Rptr. 3d 875 (Cal. Ct. App. 2006) .......................................................... 24

*Ribas v. Clark*,
696 P.2d 637 (Cal. 1985) ................................................................................ 21, 22

*Sateriale v. R.J. Reynolds Tobacco Co.*,
No. 2:09-cv-08394-CAS (SSx), 2015 WL 3767424 (C.D. Cal. June 17, 2015)....................... 21

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002)..................................................................................... 7

*Sunset Tel. & Tel. Co. v. City of Pasadena*,
118 P. 796 (Cal. 1911) .......................................................................................... 24

*TwoRivers v. Lewis*,
174 F.3d 987 (9th Cir. 1999)................................................................................. 3

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953)............................................................................................. 12

*Warden v. Kahn*,
160 Cal. Rptr. 471 (Cal. Ct. App. 1980) ............................................................. 22

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Watkins v. L.M. Berry & Co.*,
  704 F.2d 577 (11th Cir. 1983).................................................................................................... 8
*Yunker v. Pandora Media, Inc.*,
  No. 11-CV-03113 JSW, 2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) .................................. 19

**Statutes**

18 U.S.C. § 2510 ................................................................................................................................ 1
18 U.S.C. § 2511(1) ........................................................................................................................... 5
18 U.S.C. § 2511(1)(d) ...................................................................................................................... 5
18 U.S.C. § 2511(2)(c) ...................................................................................................................... 5
28 U.S.C. § 1292(b) ......................................................................................................................... 19
Cal. Pen. Code § 4 ........................................................................................................................... 23
Cal. Pen. Code § 630 .............................................................................................................. 2, 21, 23
Cal. Pen. Code § 631 ................................................................................................................... 21, 23
Cal. Pen. Code § 631(a) ................................................................................................................... 22
Cal. Pen. Code § 631(b) ................................................................................................................... 24
Cal. Pen. Code § 632 ....................................................................................................................... 21
Cal. Pen. Code § 637.3 .................................................................................................................... 22
Cal. Pen. Code § 637.6 .................................................................................................................... 22

**Rules**

Fed. R. Civ. P. 8(a)(2) ....................................................................................................................... 3

**Other Authorities**

California Law Revision Commission Staff, Study G-300, Memorandum 2014-50, *State and Local Agency Access to Customer Information from Communication Service Providers: California Wiretap Statute and Related Law*, October 1, 2014 ................................................. 22
CONCISE ENCYCLOPEDIA OF COMPUTER SCIENCE (Edwin D. Reilly ed., 2004)............................. 22
*Restatement (Second) of Contracts* § 19 (1981) .......................................................................... 7
Senate Report No. 99-541 (1986) ............................................................................................. 14, 15

### **INTRODUCTION**

Google systematically intercepts and acquires individuals' private emails. In the process, Google analyzes the contents of those emails, creates data profiles of the communicants, and serves targeted advertising in order to increase its own profits. Google also stores the contents of the emails indefinitely, allowing it to use the wealth of information it collects in the future for unknown, undisclosed, and yet-to-be-determined ends.

Google amassed this trove of email content in secret, without the consent of either the recipient or sender. In 2014, following related litigation on the issue before this Court, Google changed its Terms of Service ("TOS") and Privacy Policy, but did not alert existing Gmail users to these changes or required their affirmative consent to the changes. In any event, the changes have no bearing on, and cannot retroactively cure, Google's prior illicit interceptions. Moreover, Google continues to obscure its true practices from its own users, preventing even the potential for informed consent. Further, Google has never informed *non*-Gmail users that, whenever they communicate with Gmail users, their private messages will be intercepted, scanned, analyzed, and monetized. Instead, Google elects to mine the messages' content without even attempting to obtain the consent of non-users—parties with whom Google has no established relationship.

Google's acts violate federal and California privacy laws. In the related case, *In re Google Inc. Gmail Litig.* ("*Gmail*"), No. 13-md-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) (Koh, J.), this Court already ruled that the practices Plaintiffs complain of cannot be dismissed at the pleadings stage. Google purports to raise new issues in its Motion to Dismiss, but really it seeks only to re-litigate issues already correctly decided by this Court. Each of Google's arguments fails.

First, Google challenges Plaintiff's standing to seek injunctive relief under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* ("ECPA"), claiming that its 2014 TOS and Privacy Policy changes provide it *ex post facto* indemnification from all *prior* interceptions of email content belonging to Plaintiff and Class members. But, Google's forward-looking terms do not establish consent to (and do not even address) its past, unlawful interceptions. Accordingly, Plaintiff has standing to enjoin Google to expunge all data unlawfully acquired through such

1279927.5

- 1 -

unlawful interceptions.

Second, Google seeks to re-litigate whether its practice of intercepting and mining the content of individuals' emails is within the "ordinary course of business" of an email provider and thus outside of the scope of ECPA violations. But, Google cites no convincing authority indicating that this Court's prior analysis on this issue was incorrect—indeed, subsequent case law has only ratified this Court's view.

Finally, Google's challenge to Plaintiff's claim under the California Invasion of Privacy Act, Cal. Pen. Code §§ 630, *et seq.* ("CIPA") fails. A plain reading of the statute, coupled with applicable case law and legislative history, show that this Court's ruling that CIPA applies to email communications was entirely proper.

Google's ultimate position is that it should be allowed to eviscerate federal and state privacy laws—with roots extending back centuries through the common law—simply because it is profitable to do so. If accepted, this would allow one of the world's largest corporations an unprecedented, unlawful opportunity to continue to collect and exploit the private conversations of hundreds of thousands of individuals. In engaging in such practices, Google robs individuals of one of the most basic rights to privacy. Google's unauthorized invasion of putative class members' privacy is abhorrent and should be enjoined. Plaintiffs' claims readily survive the pleading stage.

## STATEMENT OF FACTS

Plaintiff, a non-Gmail user, alleges that Google unlawfully intercepts the content of private email messages sent to or from Gmail accounts[1] without either the sender's or the recipient's consent. Specifically, Plaintiff alleges that Google employs a variety of devices that, during the transmission of emails to and from Gmail accounts, diverts, reads, extracts, and catalogues the substantive content of the emails, and also creates derivate data therefrom. Compl. ¶¶ 1, 2, 19-21, 22-23. Google currently uses this information to profit through targeted advertising

---

[1] Google offers several variations of its Gmail product including Gmail for individual users, a version for businesses called Google Apps for Work, and a version for educational institutions called Google Apps for Education. Collectively, all Google-based email services will be referred to as "Gmail" in this pleading. Compl. n.1.

and to create individual profiles of the email communicants, which it can use to predict, influence, and manipulate consumers' behavior for its own economic advantage. Compl. ¶¶ 1-2, 16-17, 21, 28. Google stores the information indefinitely and retains the potential to use it in the future for these or other, unknown purposes. Compl. ¶ 21. Google does not notify non-Gmail users of its practices or obtain consent from them to scan, analyze, acquire or indefinitely store the content of their emails. Compl. ¶¶ 3, 18, 24-25. Moreover, neither Google's current nor its past versions of its TOS or Privacy Policy adequately inform Gmail users of its practices, and Google therefore also fails to obtain users' consent to its practices. Compl. ¶¶ 26-27. While Plaintiff opposes Google's practices, due to ubiquity of Gmail, Plaintiff must necessarily continue to send personal, private emails to Gmail users. Compl. ¶¶ 8, 29. Accordingly, Plaintiff brings claims for injunctive and declaratory relief under ECPA and CIPA on behalf of all non-Gmail users who have sent emails to or received emails from Gmail accounts. Compl. ¶¶ 4-6, 32.[2]

## LEGAL STANDARDS

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It need not contain "detailed factual allegations," but rather need only include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). This "plausibility" standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to prove that claim. *Twombly*, 550 U.S. at 556.  At the motion to dismiss stage, a court "must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066 (9th Cir. 2013) (quoting *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999)).

## ARGUMENT

### I.   Plaintiff has Standing to Seek Injunctive Relief to Remedy Google's Violations of ECPA.

Google argues that Plaintiff may not bring a claim against it for injunctive relief because,

---

[2] Plaintiff also seeks individual monetary relief. Compl. ¶¶ 55, 69.

as of April 2014, Google's users purportedly consented to the alleged illegal interceptions. Google's argument requires the Court to make the incredible finding that any post-April 2014 consent it obtains applies *retroactively*, such that Google may continue to store, analyze, and use the content of non-users' emails that Google previously acquired through its *illegal* interceptions. Such a finding would be unprecedented and is contrary to ECPA's prohibition of interceptions without *prior* consent. Moreover, there is no evidence that existing users are notified of or otherwise agree to Google's April 2014 TOS or its December 2014 Privacy Policy, and in any event those documents do not unequivocally demonstrate consent and, in fact, further obfuscate Google's practices. Finally, even if the Court were to find that all users now consent to Google's practices and that such consent applies retroactively to all past communications, Plaintiff has nevertheless adequately pled a sufficient likelihood that he will again be wronged. Plaintiff therefore has standing to pursue injunctive relief.

A.      **Google's New Terms of Service and Privacy Policy Do Not Protect it From Liability for its Prior Unlawful Interception of Non-Users' Emails.**

This Court previously found that Google's pre-2014 TOS and Privacy Policy did not establish consent to Google's interception of emails and, in fact, "could mislead users into believing that user communications to each other or to nonusers were not intercepted and used to target advertising or create user profiles." *Gmail*, 2013 WL 5423918, at *14. It is therefore undisputed that *no one*—Gmail user or non-user—consented to Google's pre-2014 practice of intercepting emails sent to and from Gmail accounts.

Google does not claim that these prior findings were incorrect, but instead offers a novel—and unconvincing—theory that its new April 2014 TOS and December 2014 Privacy Policy somehow make its prior unlawful interceptions legal. Specifically, Google argues that the "express consent" that users now purportedly give to Google "applies to *all* emails in a user's Gmail account *without* limitation to messages sent or received after any particular date." Motion to Dismiss ("Mot.") at 7 (emphasis in original). Google goes on to explain that "if Plaintiff sent an email to a Gmail users [sic] before December 2014 and that email remains in the user's account today, it is part of that user's current 'content' that he or she has agreed can be analyzed

to deliver Google service." Mot. at 8. In other words, Google asserts that because users purportedly consent to Google analyzing emails currently stored—*i.e.* not deleted—in their Gmail accounts, Google cannot be held liable for its pre-April 2014 interceptions of any such emails.

The fundamental problem with Google's argument is that, while it frames the issue as one of its current *use* of information garnered from the content of emails, the Wiretap Act prohibits *intercepting* "wire, oral, or electronic communications" without "*prior* consent." *See generally* 18 U.S.C. §§ 2511(1), 2(c) (emphasis added).[3] Google's argument that *ex post facto* consent for its continued use is equivalent to prior consent to the interception is untenable. If accepted, it would eviscerate ECPA's clear rule forbidding email interceptions undertaken without having first obtained prior consent.

Particularly in light of this Court's findings in the *Gmail* litigation, Google knows that its pre-April 2014 interceptions were unlawful. Even assuming that users now consent to Google scanning and analyzing emails currently stored in their Gmail accounts—an assumption Plaintiff disputes—this Court already has found that users *did not* consent to Google's interception of the emails sent to and from their accounts prior to April 2014. Nevertheless, Google continues to use, for its own profit, the wealth of information that it amassed pre-April 2014 through its intentional interception and diversion of in-transit email messages to separate devices that scanned, extracted, analyzed, and catalogued the emails' content. Compl. ¶¶ 1-2, 19-22. This information does not simply mirror the contents of the emails currently stored on current users' accounts, as Google's motion misleadingly implies, but rather is an agglomeration of "new, derivative" data (Compl. ¶ 20) on current users, departed users, and non-users alike created from Google's prior manipulation of email content sent to and from its servers, which included emails not currently stored on users' email accounts. It is this derivative data that Plaintiff's request for injunctive

---

[3] Even the provision of the Act that forbids the *use* of the contents of a communication does so *only if* the information was obtained through an unlawful interception. 18 U.S.C. § 2511(1)(d) (forbidding the use of information one knows or has reason to know "was obtained through the *interception* of a wire, oral, or electronic communication in violation of this subsection") (emphasis added). *See also Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 840 (N.D. Cal. 2014) ("While [section 2511(1)(d)] prohibits the *use* of the contents of a communication, that prohibition applies only if the interception itself is unlawful under section 2511(1)(a).") (emphasis in original).

relief seeks to have destroyed. Compl. ¶ 68(c).

Plaintiff's privacy was invaded by Google's interceptions. Plaintiff continues to suffer concrete and particularized legal harms by Google's continued use of personal data that Google knows was obtained through its unlawful interceptions. Plaintiff thus has standing to seek injunctive relief to stop Google's misconduct.

### B.    Current Users Do Not Consent to Google's Interception of Email Content.

"Consent to an interception can be explicit or implied, but any consent must be actual." *Gmail*, 2013 WL 5423918, at \*12 (citations omitted). As the party seeking the benefit of the consent defense, and because Plaintiff has pled that Gmail users (and non-users) *do not* consent to the new terms (*see* Compl. ¶ 29), "the burden is on [Google] to prove that it obtained consent." *In re Yahoo Mail Litig*., 7 F. Supp. 3d 1016, 1028 (N.D. Cal. 2014) (Koh, J.) (citing *In re Pharmatrak, Inc.*, 329 F.3d 9, 19 (1st Cir. 2003)). Typically, the issue of consent cannot be resolved on a motion to dismiss as it "is usually a question of fact, where a fact-finder needs to interpret the express terms of any agreements to determine whether these agreements adequately notify individuals regarding the interceptions." *In re Google Inc. Gmail Litig.*, No. 13-md-02430-LHK, 2014 WL 1102660, at \*15 (N.D. Cal. Mar. 18, 2014) (Koh., J.) (citing *Murray v. Fin. Visions, Inc.,* No. CV-07-2578-PHX-FJM, 2008 WL 4850328, at \*4 (D. Ariz. Nov. 7, 2008)).

To demonstrate consent, Google submits a declaration from a paralegal at its outside counsel's firm. *See* McCune Decl. (Dkt. No. 20-1) ¶ 1. The paralegal states that he accessed Google's April 2014 TOS and Google's December 2014 Privacy Policy by visiting two separate webpages. *Id.* ¶¶ 1, 4. The paralegal does not explain whether or how existing or new Google users are ever notified of, read, or agree to the 2014 TOS or the Privacy Policy, or even whether or how users are directed to or notified of the webpages containing those documents. The only indication of how users might "agree" to the terms in these documents comes from the 2014 TOS itself, which states that "[b]y using our Services, you are agreeing to these terms" and, near the end of the terms, directs persons to "look at these terms regularly. We'll post notice of modifications to these terms on this page." *Id.* ¶ 1 & Ex. A.

Mere use of a service, however, does not by itself create mutual assent to terms or changes

in terms regarding that service. "The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013) (Koh, J.) (quoting *Restatement (Second) of Contracts* § 19 (1981)). An entity relying on a "browse-wrap" agreement, for example, must show that "a reasonably prudent user" was put on notice, "beyond the mere existence of a link" to the terms of service on the entity's website, that the "mere use" of a website or a service would be interpreted as the user's agreement to the terms of service. *Id.* at *9 (holding that mutual assent to a browse-wrap agreement was not established where the party failed to "allege the size or typeface of the link, the perhaps central or obvious location of the link on the page, or even the text of the link"). *See also Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1178-79 (9th Cir. 2014) ("[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) (applying California law) (finding that a reference to the existence of terms at the bottom of a webpage, below where consumers could download the free software that was the subject of those terms, was insufficient to demonstrate notice to those terms).

Google fails to put forth a single fact showing how *any* user—let alone *all* users including all existing and past users across all platforms powered by Gmail—was put on notice of or otherwise assented to the April 2014 TOS or December 2014 Privacy Policy. Were Gmail users notified by direct email that Google had changed its terms, and that continued use of its services would demonstrate consent to those terms? Were users alerted to updates to Google's terms by some other manner, perhaps upon login to their Gmail accounts, and if so, how conspicuous were such alerts? Were users required to check a box stating that they read and agreed to the new terms? Or were users simply expected to find the websites containing those terms and to regularly check them for Google's very frequent (*see* Compl. ¶ 30) changes to those terms, as the terms

1279927.5                                      - 7 -                    PTF'S OPPOSITION TO MOTION TO DISMISS;
                                                                       CASE NO. 5:15-CV-04062 LHK

themselves seem to indicate? Such questions must be answered before users can be said to have been alerted to the fact of Google's practices and to have consented to such practices through continued use of Google's services. These questions cannot be answered at the pleading stage and certainly not on the basis of Google's filings.

In addition to demonstrating notification and agreement to its terms, Google must also show that the language upon which Google relies to establish consent is specific and unambiguous. *See, e.g.*, *Campbell*, 77 F. Supp. 3d at 847 (disclosure that Facebook "may use the information we received about you" for "data analysis" was "not specific enough to establish that users expressly consented to the scanning of the content of their messages—which are described as 'private messages'—for alleged use in targeted advertising."). Thus, Google must show that a reasonable user viewing those documents would understand that Google extracts and analyzes the contents of non-users' emails for the purpose of creating data profiles on individuals and providing targeted advertising, and also that Google employed these same practices to all pre-April 2014 emails. Additionally, Google interceptions must not exceed the scope of any consent that it obtains. *See Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 582 (11th Cir. 1983) ("It is the task of the trier of fact to determine the scope of the consent and to decide whether and to what extent the interception exceeded that consent."); *Gmail*, 2013 WL 5423918, at *12 ("[C]onsent is not an all-or-nothing proposition.").

For example, this Court held that prior iterations of Google's TOS and Privacy Policy did not establish consent because they suggested only that "content may be intercepted under a different set of circumstances for a different purpose—to exclude objectionable content." *Gmail*, 2013 WL 5423918, at *13. The documents also suggested that Google's targeted advertisements were based on information "stored on" or "queries made through" Google's services, or through emails sent directly to Google, and did not indicate that they would be based on emails between users and non-users. *Id.* at *13. Similarly, in *Backhaut v. Apple, Inc.,* 74 F. Supp. 3d 1033, 1045 (N.D. Cal. 2014) (Koh, J.), this Court found that consent was not established where Apple's terms suggested that iMessages would be intercepted only to facilitate their delivery, but Apple allegedly intercepted the plaintiffs' iMessages even when delivery was impossible. The consent

defense was also not established in *Opperman v. Path, Inc*., 84 F. Supp. 3d 962, 992 (N.D. Cal. 2015), where the plaintiffs "consented to the scanning of their address book data, or other use of the data solely for the purpose of 'Finding Friends'" but the defendants allegedly "exceeded the parameters of that consent by otherwise transmitting, uploading, storing, and using that information for unauthorized purposes or in unauthorized ways."

To establish consent, Google relies on a provision of its April 2014 TOS and December 2014 Privacy Policy providing that Google's "automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection. This analysis occurs as the content is sent, received, and when it is stored." McCune Decl., ¶ 2, Ex. A, & Ex. B. This provision does not adequately notify users of Google's practices. The phrase "*your* content (including emails)" suggests that only *users'* emails will be analyzed, and not those of *non-users*. *See Gmail*, 2013 WL 5423918, at *14 (finding that prior versions of Google's TOS and Privacy Policy failed to establish consent in part because they did not "specifically mention the content of users' emails to each other or to or from non-users" and were "not broad enough to encompass such interceptions"). In addition, while the provision mentions advertising, Google continues to hide the fact that it analyzes users' and non-users' email content for the purpose of creating individual data profiles of the communicants. *See Gmail,* 2013 WL 5423918, at *13 (holding that a prior version of Google's TOS did not establish consent in part because "to the extent that it suggests interceptions, [it] only does so for the purposes of providing advertising, not creating user profiles"). In the same vein, Google fails to explain that it not only "analyzes" the emails, but also extracts and separately stores and catalogues the emails' content indefinitely.

Google additionally relies on information contained in various webpage hyperlinks and/or text boxes that are attached to certain words in Google's online December 2014 Privacy Policy. For example, Google points to a bullet point in the Privacy Policy that provides "**Information we get from your use of our services.** We **collect information** about the services that you use and how you use them," and then goes on to provide several non-content based examples of such "collected information" including "Device information," "Log information," "Location

information," "Unique application numbers," "Local storage," and "Cookies and anonymous identifiers." McCune Decl. ¶ 5 & Ex. B (emphasis in original). A text box purportedly appears when a person scrolls over the words "collect information," within which the following words appear: "This includes information like . . . Gmail messages . . . or other Google-hosted content." *Id.* ¶ 5. If a person were to take the further action of clicking on a "learn more" hyperlink that appears within this text box, the person would be directed to a different webpage that further explains that Google's "automated systems analyze this information as it is sent and received and when it is stored" and that Google "may use the information in your Gmail inbox to provide you with flight notification and check-in options . . . ." *Id.* ¶ 6, Ex. C.

This cumbersome three-step process—*i.e.* (1) visiting the webpage with the December 2014 Privacy Policy; (2) scrolling over the words "collect information"; and (3) clicking on the words "learn more" in the text box that appears over the words "collect information"—evidences Google's intentional obfuscation of its practices. If a person were just to go through the first two steps, for instance, he could read the primary non-content examples of information Google collects that are listed within the Privacy Policy itself—*e.g.* "log information"—together with the brief reference to "Gmail messages" that appears in the text box, and reasonably conclude that Google doesn't collect the actual content of the emails themselves, but instead collects non-content information such as the names and email addresses of the communicants, dates and times the emails were sent or received, routing and IP address information, and so forth. Even if that person were to take the third step of clicking on the "learn more" hyperlink, it would still not be abundantly clear that Google opens and analyzes the actual content of emails, as opposed to simply collecting non-content information within a person's "Gmail inbox." Moreover, a reasonable person could conclude from words such as "your use" and "Gmail messages" that non-Gmail messages (*e.g.* Yahoo email messages) from non-users will *not* be collected.

Google's lack of clarity is made further apparent when compared with Yahoo's terms at issue in *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016.[4] Yahoo's terms clearly disclosed its practice

---

[4] Unlike the Plaintiffs here, the plaintiffs in *Yahoo* did not argue that users failed to see or read Yahoo's terms or its privacy policy, and in fact conceded that those documents comprised the agreement between the parties. *In re Yahoo Mail Litig.*, 7 F. Supp. 3d at 1029.

1279927.5                                    - 10 -                    PTF'S OPPOSITION TO MOTION TO DISMISS;
                                                                       CASE NO. 5:15-CV-04062 LHK

of analyzing and scanning *non-users'* emails, and placed the responsibility on Yahoo users to notify non-users of this practice. *See id.* at 1021. Yahoo's terms also made clear that it "scan[s] and analyze[s] all incoming and outgoing communications *content* sent and received"; that it not only collects but also "stores the data"; and that it does so for various specified purposes including "targeted advertising." *Id.* at 1022  (emphasis added). In sharp contrast to Yahoo's terms, the provisions on which Google relies are not sufficiently specific or clear enough to alert users to the alleged practices.

Finally, Google's consent argument is completely irrelevant to the multitude of users with .edu accounts powered by Gmail. Bowing to scrutiny following the *Gmail* litigation, in April 2014, Google ceased intercepting, scanning, and cataloging the contents of emails it provides to its educational clients via its Google Apps for Education product.[5] Accordingly, even if a .edu account user stumbled upon Google's various changes to its TOS, such revisions did not apply to them regardless their construction or import.

Because Google has not shown that *any*, let alone *all*, users saw and consented to its April 2014 TOS or December 2014 Privacy Policy, or that a reasonable person reading those documents would understand that Google scans, analyzes, and stores Gmail users and non-user's email content indefinitely to create individual profiles and to provide targeted advertising, Google has not established consent as a matter of law. Plaintiffs have standing to seek injunctive relief.

**C.    Plaintiff Adequately Pled a Sufficient Likelihood of Future Harm.**

Even if the Court were to find that Google now alerts all users, across all platforms, to the complained-of practices and that such notice applies retroactively to pre-alert email interceptions, such findings would still not preclude Plaintiff from seeking injunctive relief. To establish standing for prospective injunctive relief, Plaintiff need only demonstrate that "he has suffered or is threatened with a 'concrete and particularized' legal harm . . . coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111

---

[5] Alistair Barr, *Google Stops Scanning Student Gmail Accounts for Ads*, Wall St. J. (Apr. 30, 2014, 6:00 AM ET), *available at* http://blogs.wsj.com/digits/2014/04/30/google-stops-scanning-student-gmail-accounts-for-ads/.

1279927.5

- 11 -

(1983)). A "sufficient likelihood" of future harm may be shown in at least two ways: (1) "the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy"; and (2) "the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights." *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (citations omitted). A "voluntary cessation" of a practice or policy does not deprive a plaintiff of the ability to seek injunctive relief unless it is "absolutely clear [that] the alleged[ly] wrongful behavior could not reasonably be expected to recur." *Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 860 (N.D. Cal. 2011) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). *See also Campbell*, 77 F. Supp. 3d at 849 (denying request to strike injunctive relief because the plaintiffs adequately alleged a sufficient likelihood that the defendant could resume a practice it ceased "nearly two years ago"). Defendant bears "a heavy burden . . . to show that there is no reasonable expectation of repetition." *Olagues v. Russoniello*, 770 F.2d 791, 794-95 (9th Cir. 1985) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

Google's purported notification of its practices to users through its TOS and Privacy Policy does not bar Plaintiff from seeking injunctive relief because Google remains free to modify its terms and policies at any time, in any manner, and without alerting its users of such changes. *See* McCune Decl. Ex. A ("We may modify these terms . . . to, for example, reflect changes to the law or changes to our Services. . . . We'll post notice of modifications to these terms on this page."). Indeed, Google routinely modifies its TOS and Privacy Policy; in 2015 alone, it changed its Privacy Policy at least three times. Compl. ¶ 30. And, Google has a history of hiding its email scanning practices through oblique "disclosures" and also through its own affirmative misrepresentations regarding such practices. Compl. ¶ 31. Thus, Google has not met its heavy burden to show that its practice of intercepting, scanning, analyzing, and storing users' and non-users' email contents *without* any person's actual consent is not likely to recur.

## II.   **Google's Interception of Third Parties' Emails Does Not Fall Within the Ordinary Course of Business of an Electronic Communications Service Provider.**

### A.   **This Court's Prior Opinion in *Gmail* Correctly Interpreted The Language and Purpose of ECPA.**

In challenging the Court's prior holding in *Gmail*, Google contorts the plain language of

section 2510(5)(a)(ii) of ECPA, depriving it of its common sense meaning. Mot. at 9-10. Specifically, Google argues that, when parsed, the words "in the ordinary course of its business" entitle the Company to do *anything it wants* with the contents of Class members' personal communications, so long as that act is undertaken in the pursuit of profit. *Id*. However, the logical reading of section 2510(5)(a)(ii) dictates that the word "ordinary" should circumscribe the word "business," not the other way around, and Google's argument to the contrary has been rejected consistently in the context of scanning and cataloging email content. *Gmail*, 2013 WL 5423918, at *8 ("The presence of the modifier 'ordinary' must mean that not everything Google does in the course of its business would fall within the exception."); *Campbell*, 77 F. Supp. 3d at 844 ("The court rejects the suggestion that any activity that generates revenue for a company should be considered within the 'ordinary course of its business.' . . . [T]he statute's inclusion of the word 'ordinary' implies some limits on a company's ability to self-define the scope of the exception.").[6] Moreover, this exception is limited to the ordinary course of business of an *electronic communications service provider*. This limiter (to a type of business) further constrains Google, highlights the weakness in Google's view, is consistent with this Court's approach, and is consistent with how ordinary course of business has been interpreted in other contexts.

The lone case Google cites for its improbable reading of ECPA's "ordinary course of business" defense contains a textual analysis solely focused on the presence of the word "business" and fails to account for the limiting effect of the modifier "ordinary." *See In re Google, Inc. Privacy Policy Litig*. ("*Privacy Policy*") No. C-12-01382-PSG, 2013 WL 6248499, at *10-11 (N.D. Cal. Dec. 3, 2013). The better approach is the one advanced by this Court, which has been subsequently adopted in this district by a court considering virtually identical claims and facts. *See Campbell*, 77 F. Supp. 3d at 844.

Similarly, Google's argument that the Court misread a companion clause of ECPA is unavailing. Mot. at 10-12. The *Gmail* opinion's analysis of section 2511(2)(a)(i) led the Court to

---

[6] Google's argument that Congress could have *further* limited the section 2510(5)(a)(ii) only to acts such as "providing a communication service" or facilitating "the transmission of communications" proposes a distinction with no difference—such words of limitation are synonymous with the word "ordinary" in this context, and thus would amount to surplussage. Their omission, by Congress, is of no significance.

conclude that the section's prohibition on "service observing or random monitoring [for purposes other than] mechanical and service quality control checks" evidenced a Congressional intent to prevent "unlimited leeway" for electronic communications service ("ECS") providers such as Google. 2013 WL 5423918, at *9. Google contends that the Court's analysis is flawed because the provision at issue is directed towards wire communication services, and not ECS providers. Mot. at 11. This misses the mark. The legislative history of ECPA further clarifies this provision, making plain that *no one* is supposed to acquire message content for purposes of divining that content's meaning:

> Section 2511(2)(a)(i), as amended, specifies that it is not unlawful for the employees of providers of wire or electronic communication services to intercept, disclose or use customer communications in the normal course of employment while engaged in any activity which is a necessary incident to the rendition of the service or to the protection of the rights or property of the provider, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality checks. In applying the second clause only to wire communications, this provision reflects an important *technical* distinction between electronic communications and traditional voice telephone service. The provider of electronic communications services *may have to monitor a stream of transmissions in order to properly route, terminate, and otherwise manage the individual messages they contain.* These monitoring functions, which may be necessary to the provision of an electronic communication service, do not involve humans listening in on voice conversations. Accordingly, they are not prohibited. In contrast, the traditional limits on service "observing" and random "monitoring" do refer to human aural interceptions and are retained with respect to voice or "wire" communications.

Plaintiff's Request for Judicial Notice, Ex. B [Senate Report No. 99-541 (1986)] (emphasis added). This legislative history bolsters the Court's statutory interpretation in *Gmail* and clarifies that Congress intended to create a dichotomy between processing emails to transmit the communications, on the one hand, and intercepting private email contents to acquire the *meaning* of those messages, on the other. Specifically, this Senate Report acknowledged a "technical" distinction between email and telephone communications in that, unlike analog phone communications, email providers may have to "monitor a stream" of emails "in order to properly route, terminate, and otherwise manage" the emails. *Id.* However, when a service provider of any stripe engages in "listening in on . . . conversations"—the precise activity of which Google stands

1279927.5                                     - 14 -                    PTF'S OPPOSITION TO MOTION TO DISMISS;
                                                                        CASE NO. 5:15-CV-04062 LHK

accused—such activity is not within the ordinary course of business. *Id.*; *Gmail,* 2013 WL 5423918, at *10 ("[T]he Court concludes that the legislative history supports a narrow reading of the section 2510(5)(a)(ii) exception, under which an electronic communication service provider must show some link between the alleged interceptions at issue and its ability to operate the communication system. Google's broader reading of the exception would conflict with Congressional intent.").

Google's attempts to distort the plain language of ECPA are unavailing. The Court's reasoning in *Gmail* was proper, and is supported by subsequent case law applying the Court's *Gmail* analysis and by the language and legislative history of ECPA.

### B.      Google's Cases Do Not Support Its Motion.

The cases relied on by Google are readily distinguishable, most notably because they did not involve the interception of message *content*. For instance, *Hall v. EarthLink Network, Inc.*, dealt with the claims of a disgruntled Earthlink email account-holder who, after his account was closed due to a technical error, sued Earthlink for failing to bounce emails received after the account was closed. 396 F.3d 500, 502 (2d Cir. 2005). The Second Circuit held that the account-holder's privacy had not been compromised, and thus that Earthlink did not violate ECPA given that (1) there was no evidence that the mere receipt of emails was outside Earthlink's ordinary course of business as an email provider; and (2) Earthlink did not have the technological capability to cease receiving emails after the closing of an account. 396 F.3d at 505. Here, by contrast, beyond simply "receiving" the emails of Class members, Google accessed, analyzed, and used the content within those emails. Further, Google cannot dispute that it has the technology to transmit emails without acquiring and cataloging their contents, as it now does on .edu platforms powered by Gmail. *See supra*, n.5.

Google's other principal authority, *Kirch v. Embarq Mgmt. Co.*, further clarifies that the ordinary course of business exception does not apply when an ECS provider accesses electronic communications to acquire their content. 702 F.3d 1245 (10th Cir. 2012). *Kirch* concerned an internet service provider, Embarq, that had given third party advertiser, NebuAd, access to user data flowing over its network. Only NebuAd had examined the transmissions to discern their

content and meaning. *Id.* at 1250. The court held that Embarq had *not* violated ECPA since, although it had the ability to access the user data, it never actually examined "any of the raw data that NebuAd may have looked at[.]" *Id*. Implicit in this holding is that if Embarq *had* attempted to divine the contents of user transmissions, it would have violated ECPA just like NebuAd had done.[7] Indeed, this Court has already reached this conclusion. *See Gmail,* 2013 WL 5423918, at *8 ("Considered practically, Google is more akin to NebuAd, which intercepted data for the purpose of providing targeted advertising—a purpose separate and apart from Embarq's provision of internet service."); *accord Campbell*, 77 F. Supp. 3d at 843 ("[B]ecause there was no aiding-and-abetting liability under the Wiretap Act, Embarq could not be held responsible for any alleged interception by NebuAd."). Google's reliance on *Kirch* is misplaced.

Google cites to the opinion in *Privacy Policy* for an interpretation of the "ordinary course of business" so broad as to justify *any* conduct undertaken by a company, so long as it is undertaken for profit. But, the *Privacy Policy* opinion improperly conflated the "ordinary course of business" defense with the defense of consent, thus limiting the value of the holding and making it an outlier. In *Privacy Policy*, users complained that Google had adopted a universal policy covering all of its services—*e.g.*, Gmail, YouTube, Google Maps, etc.—which enabled it to share user data across all of these services. 2013 WL 6248499, at *2. Previously, such data were not comingled. *Id*. at *1. Thus, the plaintiffs did not plead that Google had done anything surreptitiously, but rather had acted in accord with its *announced* practices. *Id*. at *11  ("Here, Plaintiffs['] claim is not that Google did anything in secret, but rather that it *publicly announced a new practice* in conflict with it[s] prior representations.") (emphasis added). In its "ordinary course of business" analysis, the court improperly seized on the issue of whether or not the business practice was *disclosed. See id.*  Thus, under the *Privacy Policy* view, if a service provider announces its business model through a privacy policy, it is presumed that any practices so disclosed are part of the company's "ordinary course of business," but this mistakes the "ordinary course of business" defense for the defense of consent.[8] This collapsed analysis of

---

[7] The *Kirch* plaintiffs settled their claims against NebuAd in a prior proceeding. 702 F.3d at 1248, n.2.

[8] Under the ECPA, these are two, distinct inquiries. The first question asked should be "Was the

1279927.5                                    - 16 -                    PTF'S OPPOSITION TO MOTION TO DISMISS;
                                                                        CASE NO. 5:15-CV-04062 LHK

*Privacy Policy* limits its value as authority for a narrow reading of section 2510(5)(a)(ii).

To the extent that *Privacy Policy* addressed the language in section 2510(5)(a)(ii) in fashioning a broad reading of the "ordinary course of business" defense, the analysis focused solely on the presence of the word "business" and neglected to account for the limiting effect of the modifier "ordinary." As discussed above, this inverts the critical inquiry—the limiting modifier "ordinary" must be reconciled with Congressional intent. *See Gmail*, 2013 WL 5423918, at *10; *Campbell*, 77 F. Supp. 3d at 844 (ECPA's "inclusion of the word 'ordinary' implies some limits on a company's ability to self-define the scope of the exception. An electronic communications service provider cannot simply adopt any revenue-generating practice and deem it 'ordinary' by its own subjective standard."). The *Privacy Policy* court questioned "what exactly its [sic] means for a given action to be 'necessary' to the delivery of Gmail," 2013 WL 6248499, at *11, but even so it tacitly recognized that there must be *some* purpose related to providing the actual email product for section 2510(5)(a)(i)'s protections to apply. The court asked "in delivering Gmail is it really 'necessary' do [sic] more than just the comply with email protocols such as POP, IMAP and MAPI? What about spam-filtering or indexing? None of these activities have anything specifically to do with transmitting email." *Id*. This analysis does not provide examples of an ECS provider surreptitiously reading private emails for profit, but rather lists features common to many email processing systems that are used in the furtherance of providing email services to customers. Such examples—spam filtering and indexing for user-archival or user-search purposes—are easily accounted for in the *Gmail* opinion's articulation of the scope of the "ordinary course of business" defense.

Finally, the *Privacy Policy* opinion did not substantively distinguish *Gmail's* analysis of the ECPA's statutory scheme, case law, or legislative history. To the extent the opinion addressed this Court's holding in *Gmail*, it did so exclusively on the grounds that "among other things, the

---

accused device necessary to the ordinary course of the defendant's business?" (implicating section 2510(5)(a)(ii)). If the answer is "no," the second question should be "Did the plaintiff nonetheless consent to the interception?" (implicating section 2511(2)(d)). *See, e.g.*, *Arias v. Mutual Cent. Alarm Serv.*, 202 F.3d 553, 559 (2d Cir. 2000) ("Given the existence of this distinct consent exception, we hold that it is a misreading of Title III to import wholesale a consent requirement into the ordinary course of business analysis at issue here.").

court's thorough analysis addressed allegations that Google's practices violated its own internal policies, further establishing that its actions are outside the course of its business." *See id*. at \*11.

Courts tasked with addressing specific allegations of an ECS provider scanning and cataloging the contents of its users' emails consistently have held that such activity is not within the "ordinary course of [the provider's] business." *Gmail*, 2013 WL 5423918; *Campbell*, 77 F. Supp. 3d; *Dunbar v. Google, Inc*., No. 5:10-CV-194-DF, 2011 U.S. Dist. LEXIS 157932, at \*11 (E.D. Tex. May 23, 2011) (when scanning was for purposes other than facilitating email transmission, "[t]he applicability of the 'ordinary course of business' exception . . . cannot be resolved at the pleading stage."); *Marquis v. Google, Inc.*, No. 11-02808, Super. Ct. of Mass., at Suffolk at 8-9 (Jan. 17, 2012) (same, interpreting an analogous Massachusetts state wiretapping law). The cases cited by Google are inapposite, and the Court should therefore not revisit its prior holding in *Gmail*.

**C.     There is No Legitimate Nexus Between the Interception of Private Email Message Content and the Ordinary Business Practices of an ECS.**

Nor may Google claim that its surreptitious scanning and cataloging of people's emails— including Class members with whom it has no business relationship—has a sufficient "nexus between the need to engage in the alleged interception and the subscriber's ultimate business, that is, the ability to provide the underlying service or good." *Gmail*, 2013 WL 5423918, at \*11. Google states that "revenue generated from targeted advertising is precisely what enables Google's 'ability to provide the underlying service' of Gmail to its users and to do so *for free*." Mot. at 15 (emphasis in original). This misses the point—the nexus described by the Court in the *Gmail* opinion is not between message interception on the one hand and the ECS provider's *business model*, on the other. *See id.* at \*11  ("ordinary course of business" does not apply where "Google intercepts emails for the purposes of creating user profiles and delivering targeted advertising, which are not instrumental to Google's ability to transmit emails."); *see also Campbell*, 77 F. Supp. 3d at 844 ("[T]he court cannot find any facts alleged in the complaint or facts presented by Facebook that indicate a nexus between Facebook's alleged scanning of users'

private messages for advertising purposes and its ability to provide its service.").[9] The fact that Google might garner more profit from scanning and cataloging email content does not mean that such practices facilitate the transmission of emails such that section 2510(5)(a)(i)'s applies.

Moreover, even if Google's interpretation was the correct standard, it has not shown that surreptitiously scanning and cataloging email content is the *only* way it would be able to create individual profiles, serve targeted ads, or to provide its email services for free. Indeed, Google has demonstrated that it is entirely capable of *not* creating data profiles or serving targeted ads in the course of providing email services: In response to the public outcry from the *Gmail* litigation, Google ceased intercepting and mining the contents of emails transmitted via its educational product, Google Apps for Education.[10] This fact, alone, demonstrates that there is no nexus between Google's interceptions and its underlying ability to transmit emails.

For the foregoing reasons, the Court should decline to revisit its ruling in *Gmail*.

### III. The Court Should Not Take the Extraordinary Step of Certifying a Settled Legal Question Under 28 U.S.C. § 1292.

Concerning interlocutory appeals under 28 U.S.C. § 1292(b), the Ninth Circuit is clear that only "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978)); *see also Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, No. C 01-2821, 2004 WL 838160, at *2 (N.D. Cal. Apr. 19, 2004) (appeals under section 1292(b) "are to be permitted 'sparingly,' *i.e.*, only in 'exceptional' and 'extraordinary' circumstances.") (quoting *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1068 n.6 (9th Cir. 2002)); *Luchini v. Carmax, Inc.*, No. CV F 12-0417 LJO DLB,

---

[9] Google's misstates the Court's holding in *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012). The portion of the opinion cited to in Google's motion dealt with a claim for invasion of privacy arising under the California Constitution—involving a different legal analysis than ECPA—and moreover the data at issue were items such as unique device identifiers and geolocation, not the individual contents of private communications. *Id.* Google's additional citations are equally infirm, for the same reasons. *Yunker v. Pandora Media, Inc.*, No. 11-CV-03113 JSW, 2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) (addressing a California constitutional right to privacy claim, with regard to surreptitious acquisition of geolocation data); *Folgelstrom v. Lamps Plus, Inc.*, 125 Cal. Rptr. 3d 260, 264-65 (Cal. Ct. App. 2011) (same).

[10] *See supra*, n.5.

1279927.5                          - 19 -

2012 WL 3862150, at *2 (E.D. Cal. Sept. 5, 2012) ("Section 1292(b) is meant to be used sparingly, and appeals under it are, accordingly, hen's-teeth rare.").

No exceptional circumstances exist in the instant matter. Instead, Google's position rests on a false premise—namely, that a "substantial ground for difference of opinion exists" with regard to the scope of the "ordinary course of business" defense. Mot. at 17-18. As discussed above, courts addressing ECPA claims directly challenging the scanning and cataloging of email content consistently have rejected the proposition that such acts were within the ordinary course of the defendant's business. *Gmail*, 2013 WL 5423918; *Campbell*, 77 F. Supp. 3d 836; *Dunbar*, 2011 U.S. Dist. LEXIS 157932; *Marquis*, No. 11-02808, Sup. Ct. of Mass. at Suffolk, at 8-9 (Jan. 17, 2012).

Thus, there is not only no *substantial* ground for a difference of opinion in these cases, there is no difference of opinion, full stop. Google's argument that "Judge Hamilton plotted a third course in *Campbell v. Facebook*" misstates the holding in that case. Mot. at 18. In actuality, Judge Hamilton applied this Court's *Gmail* analysis and came to the same conclusion as the Court, finding (1) that "there must be 'some nexus between the need to engage in the alleged interception and the subscriber's ultimate business, that is, the ability to provide the underlying service or good,'" and (2) that nothing "indicate[d] a nexus between Facebook's alleged scanning of users' private messages for advertising purposes and its ability to provide its service." 77 F. Supp. 3d at 844. Google fails to demonstrate, and indeed cannot demonstrate, how the *Campbell* opinion reaches a different conclusion than the Court's ruling in *Gmail*. This is because the two opinions are perfectly consistent. Further, as discussed above, Google's reliance on Magistrate Judge Grewal's opinion in *Privacy Policy* is misplaced. The underlying claims in that case arose from a publicly announced change to Google's TOS, and much of the *Privacy Policy* court's analysis of the scope of section 2510(5)(a)(ii) improperly conflated the "ordinary course of business" with issues of user consent. *See* 2013 WL 6248499, at *10-11. *Privacy Policy* is therefore an outlier and does not establish any significant difference of opinion on the scope of the "ordinary course of business" defense in the context of scanning emails to facilitate targeted advertising. Indeed, it exists outside of the wholly consistent constellation of opinions, cited

above, that decline to extend "ordinary course of business" protection to ECS providers engaged in the practice of scanning emails for profiling and targeting advertising purposes. Thus, interlocutory review would be inappropriate here. *See Sateriale v. R.J. Reynolds Tobacco Co.*, No. 2:09-cv-08394-CAS (SSx), 2015 WL 3767424, at *3 (C.D. Cal. June 17, 2015) (declining to certify interlocutory appeal where defendant's "proffered controlling question of law . . . is not unclear.").

At bottom, Google's only argument for seeking interlocutory review is that it disagrees with the Court's prior holding, but "[a] party's strong disagreement with the Court's ruling is not sufficient for there to be a 'substantial ground for difference.'" *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010).[11] Accordingly, the Court should decline to take the extraordinary step of certifying for interlocutory appeal a question of law that is consistently applied in this district.

## IV.    The Court Has Jurisdiction Over Plaintiff's CIPA Claim.

Google's CIPA jurisdiction argument is not a "novel" legal issue—it is one that this Court specifically analyzed and decided in *Gmail*. Google's effort to distinguish CIPA from ECPA, in order to bolster a comity argument, is similarly wrongheaded: This Court *should* exercise supplemental jurisdiction over Plaintiff's CIPA claim because CIPA is harmonious with ECPA in terms of its underlying policy, construction, and application. CIPA is an expansive statute, meant generally to "protect the right of privacy of the people of this state." Cal. Pen. Code § 630.[12] Its multiple provisions safeguard a wide array of privacy interests—from broad protections barring wiretapping, Cal. Pen. Code § 631, and eavesdropping, Cal. Pen. Code § 632, to specific

---

[11] Google's argument that an interlocutory appeal "could significantly impact Internet companies and current and future litigation over this issue" is similarly misleading. Mot. at 17. While Google is correct that other companies such as Yahoo and Facebook have been sued for ECPA violations and have asserted the "ordinary course of business" defense (Mot. at 17, fn. 19), the very opinions that Google cites to have either declined to rule on the scope of the defense (*In re Yahoo Mail Litig.*, 7 F. Supp. 3d at 1035 n.3) or have held that the defense did not apply to the challenged practices (*Campbell*, 77 F. Supp. 3d at 844).  Thus, under the examples that Google provides, an interlocutory appeal would have no effect other than providing Google (and all other ECS provider defendants in comparable cases) a second bite at the apple.

[12] "In enacting this statute, the Legislature declared in broad terms its intent 'to protect the right of privacy of the people of this state' from what it perceived as 'a serious threat to the free exercise of personal liberties [that] cannot be tolerated in a free and civilized society.' (Pen. Code, § 630.) This philosophy appears to lie at the heart of virtually all the decisions construing the Privacy Act." *Ribas v. Clark*, 696 P.2d 637, 639-40 (Cal. 1985).

protections such as prohibiting disclosure of carpooling information, Cal. Pen. Code § 637.6, and barring the use of lie detector tests without express written consent, Cal. Pen. Code § 637.3.

Among other provisions, Google has violated CIPA section 631, which protects the privacy of individuals' communications in three ways. First, it bars tapping the channels of communication;[13] second, it bars reading other people's communications;[14] and finally it bars using any information gained by such snooping.[15] Google's systematic practice of intercepting emails sent by Plaintiff and the putative class members, reading those emails' contents, and using that content—to create individual profiles on the communicants, perform data analytics, and bolster Google's bottom line— squarely violates each of these three prohibitions.[16]

No California state appellate court has yet addressed whether an email is or is not a "communication" within the ambit of CIPA. But email is the most common form of written communication in our society today.[17] And in the year since this Court's rulings in *Gmail* and in *Yahoo*, those rulings have been cited approvingly by other trial courts in California[18] and by California state agencies.[19] Plaintiff has not found, and Google has not cited, *any* case that disagrees with these rulings. There is no reason to change course. This Court should accept supplemental jurisdiction over Plaintiffs' CIPA claims.

---

[13] Cal. Pen. Code § 631(a) (establishing liability for a party "intentionally taps, or makes any unauthorized connection" to a communication channel).

[14] Cal. Pen. Code § 631(a) (establishing liability for a party "who . . . reads . . . the contents or meaning of any . . . communication while the same is in transit . . . or is being sent from, or received at any place within this state . . . .").

[15] Cal. Penal Code § 631(a) (establishing liability for a party "who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information . . . obtained [in violation of § 631(a)]").

[16] *See Ribas*, 696 P.2d at 640 (citing *Warden v. Kahn*, 160 Cal. Rptr. 471, 476-77 (Cal. Ct. App. 1980)). ("While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.")

[17] CONCISE ENCYCLOPEDIA OF COMPUTER SCIENCE, p.300 (Edwin D. Reilly ed., 2004).

[18] *See, e.g.*, *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD, 2015 WL 6438744, at *10 (N.D. Cal. Oct. 23, 2015).

[19] *See, e.g.*, California Law Revision Commission Staff, Study G-300, Memorandum 2014-50, *State and Local Agency Access to Customer Information from Communication Service Providers: California Wiretap Statute and Related Law*, October 1, 2014, at n.6, *available at* http://www.clrc.ca.gov/pub/2014/MM14-50.pdf (citing *Gmail* for its holding that "Section 631 applies to email.").

1279927.5                                    - 22 -                  PTF'S OPPOSITION TO MOTION TO DISMISS;
                                                                    CASE NO. 5:15-CV-04062 LHK

## V.    Google's Practices Violate CIPA.

In *Gmail*, the Court found that CIPA prohibits Google's unauthorized interception and analysis of email content. That ruling was correct then and remains correct today. Google disagrees and seeks to re-argue that CIPA does not protect against invasions of privacy when the communication is an email. Google argues (1) that CIPA is solely concerned with "eavesdropping" and not email privacy; (2) that amendments to the California Wiretap Act (Cal. Pen. Code § 629.50) should limit the scope of CIPA; and (3) that Google is a public utility and thus free to violate Plaintiffs' privacy. All three arguments fail.

First, as described in Section IV above, CIPA covers far more than just listening to oral communications. The very title of the "California Invasion of Privacy Act" reveals its broad scope, and section 630's statement of intent dispels any doubt: "The Legislature by this chapter intends to protect the right of privacy of the people of this state." Cal. Pen. Code § 630. The Penal Code also specifically rejects Google's narrow interpretation: "The rule of the common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." Cal. Pen. Code § 4.

The term "eavesdropping" is not defined in CIPA, but section 631—the core of Plaintiff's CIPA claim—shows that the term is far broader than Google suggests, as it expressly prohibits "read[ing], or attempt[ing] to read, or [] learn[ing] the contents or meaning of any message, report, or communications while the same is in transit . . . ." Cal. Pen. Code § 631. This district accordingly has read section 631 to cover Internet communications. *See, e.g., Campbell*, 77 F. Supp. 3d at 848 (plaintiffs' allegations that Facebook scans the content of "private messages" sent to and from users through Facebook sufficiently stated a CIPA claim). Thus, Google's position that CIPA prohibits *only* "listening to the private conversation of others" (Mot. at 20) lacks support and conflicts with applicable authority.

Further, Google's narrow interpretation is belied by its own authorities. For example, Google seeks to undermine this Court's reliance on *Davis v. Pac. Tel. & Tel. Co.*, 59 P. 698 (Cal. 1899), which holds that the Penal Code should be interpreted broadly to include new

1279927.5                                                   - 23 -                          PTF'S OPPOSITION TO MOTION TO DISMISS;
                                                                                            CASE NO. 5:15-CV-04062 LHK

technologies, by citing to *Sunset Tel. & Tel. Co. v. City of Pasadena*, 118 P. 796 (Cal. 1911). Mot. at 22. Google claims that the court in *Sunset Telephone* rejected the reasoning and holding of *Davis*. But the court in *Sunset Telephone* spoke <u>approvingly</u> of *Davis.* It merely distinguished *Davis* as interpreting the <u>penal code</u>, which was not the issue in *Sunset Telephone. Sunset Telephone* concerned the proper interpretation of a grant of public property rights from the state to a private actor. *See Sunset Telephone*, 118 P. at 800 ("[W]e are satisfied that the decision in *Davis v. Pacific Tel. & Tel. Co*., 127 Cal. 312, 57 Pac. 764, 59 Pac. 698, cannot be taken as definitely settling the meaning of the word 'telegraph,' as the same is used in section 536 of the Civil Code. The question there was whether the words 'any line of telegraph' as used in section 591 of the Penal Code, as it existed prior to the year 1905, included a telephone line."). Unlike the penal code, public grants are construed strictly. *Id.; see also Red Mountain LLC v. Fallbrook Pub. Util. Dist.*, 48 Cal. Rptr. 3d 875, 886 (Cal. Ct. App. 2006).

Second, Google's claim to the protections of a "public utility" under the Act is disingenuous. Google is not regulated as a public utility and opposes being treated as one, since that would entail significant regulatory oversight, including regulation of its vast revenues and profits.[20] In February 2015, Eric Schmidt (Google's CEO) appeared on the Brian Lehrer Show on National Public Radio and, when asked whether Google should ever be regulated as a public utility, he answered "No."[21] Google cannot claim the rights of a public utility (including the liability exemptions) while shirking all concomitant responsibilities.

Even if Google were a public utility, section 631 does not give public utilities *carte blanche*. Instead, it provides an exception that is nearly identical to the "ordinary course of business" defense in ECPA. The pertinent language states that section 631 "shall not apply . . . to any public utility engaged in the business of providing communications services and facilities . . . where the acts otherwise prohibited herein are for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility." Cal. Pen. Code § 631(b).

---

[20] As reported by Forbes, on July 16, 2015 Google posted second quarter 2015 results reflecting 11% year-on-year growth in revenues to $17.72 billion. Operating cash flow was $7 billion. Profits were $5.98 billion.

[21] *That Time Brian Asked Eric Schmidt if Google is a Public Utility*, Brian Lehrer Show, Feb. 20, 2015, *available at* https://www.wnyc.org/radio/#/ondemand/432619.

Thus, for the same reasons stated in Section II, Google's interception and cataloging of private emails and their content for profiling and advertising purposes falls outside of the protections of section 631(b).

Finally, Google's silence-means-consent argument, premised on amendments to a different statute, should be rejected. Google confuses the fundamental differences in purpose and history between the California Wiretap Act (section 629.50, "CWA") and CIPA (section 630 *et seq*.). The CWA was passed decades *after* CIPA and was designed to carve out a limited, enumerated list of wiretapping exceptions *for law enforcement use*. The CWA was necessary because CIPA prohibits wiretapping, even by state law enforcement. The underlying public policy unifying the two statutes—protection of privacy with specific later-created exceptions for important law enforcement goals—requires reading the CWA's list of permissible wiretapping circumstances narrowly and the CIPA's protections broadly.[22]

In sum, this Court was correct when it rejected Google's arguments and upheld the plaintiffs' CIPA claim in *Gmail*. Neither the law nor the facts have changed since that decision. The Court should therefore again find that CIPA protects the privacy of email content against Google's practice of reading and analyzing private emails without the communicants' consent.

## CONCLUSION

For the foregoing reasons, Google's motion to dismiss should be denied.

Dated: December 4, 2015  Respectfully Submitted,

By: */s/ Michael W. Sobol*
  Michael W. Sobol

Michael W. Sobol (State Bar No. 194857)
Nicole D. Sugnet (State Bar No. 246255)
Michael Levin-Gesundheit (State Bar No. 292930)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

---

[22] *See, e.g.*, *People v. Leon*, 32 Cal. Rptr. 3d 421 (Cal. Ct. App. 2005), *aff'd* 150 P.3d 207 (Cal. 2007) (rejecting, on public policy grounds, a trial court's broadened interpretation of the "necessity" requirement in the CWA in favor of narrow interpretation, noting that "Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices.")

Hank Bates (State Bar No. 167688)
CARNEY BATES & PULLIAM, PLLC
2800 Cantrell Road, Suite 510
Little Rock, AR 72202
Telephone: 501.312.8500
Facsimile: 501.312.8505

Ray E. Gallo (State Bar No. 158903)
Dominic Valerian (State Bar No. 240001)
GALLO LLP
1299 Fourth St., Suite 505
San Rafael, CA 94901
Phone: 415.257.8800

*Attorneys for Plaintiff*